UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-10976
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CRAIG E. CALDWELL,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Northern District of Texas
(3:96-CR-95-T)
_____

July 2, 1997

Before REAVLEY, JOLLY, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:[*]

Craig E. Caldwell makes several challenges to his conviction

for soliciting another person to commit arson in violation of 18

U.S.C. §§ 373(a) and 844(i). He also argues that the district

court improperly enhanced his sentence based on an erroneous

finding of obstruction of justice. Finding no error, we affirm.

I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this
opinion should not be published and is not precedent except under
the limited circumstances set forth in 5TH CIR. R. 47.5.4.

The Government presented evidence that the appellant, Craig E. Caldwell, owned Simpson Funeral Home, which was located in Inglewood, California. The property was purchased in the name of Victoire Hovland,[2] who was Caldwell's girlfriend. Caldwell referred to her as a "straw buyer."

In June of 1995, the insurance coverage for the funeral home was cancelled due to a late payment, and Caldwell called an insurance broker to reinstate the coverage. Initially, they were unsuccessful in reinstating the policy, and Caldwell indicated that he would seek coverage elsewhere. Approximately a month later, Caldwell contacted the broker again requesting coverage. On July 18, 1995, the broker secured another policy insuring the building for $1,000,000. Caldwell then informed the broker that the coverage should be $1,500,000 because of improvements that had been made on the funeral home. The broker raised the limits of the policy accordingly.[3]

Subsequently, in September of 1995, Caldwell and his business associate, Dahn Walker, were flying from Phoenix to Dallas, and on that flight met Walter Axley, who was a skip tracer for a bail bond company in the Dallas, Texas area. After some conversation regarding the bail bond business, Caldwell remarked that Axley must know all types of people in that business and asked whether he knew

---

[2] She was also referred to as "Vicki" or "V.V." Hovland.

[3] On January 30, 1996, Caldwell discussed increasing the policy limits another $250,000, and requested a quote from the insurance broker. That increase was never effectuated.

someone who could burn down a building. Axley replied that his brother-in-law possibly could do it. Nothing else was said about arson during the flight. Caldwell and Axley exchanged business cards prior to deplaning.

Axley reported the conversation to an IRS agent he knew from working undercover on one of the agent's investigations. Because the agent thought Caldwell was just a "kook," he advised Axley to "blow [Caldwell] off." No investigation was instigated at that point.

A week or so later, Caldwell contacted Axley in Dallas. Caldwell and Walker met with Axley and discussed surety bonds; however, there was no mention of arson. Pursuant to Caldwell's request, Axley introduced him to an individual who was in the business of providing financial guaranty bonds. The next day Caldwell instructed Axley that in the future the proposed arson should be referred to as the "insurance thing or the insurance company."

On November 13, 1995, at another meeting with Axley, Caldwell brought a gray binder containing photos of the targeted building, information about its location, and a floor plan. He told Axley where the furnaces were located and the easiest access into the building. Caldwell was willing to pay up to $5,000 in expenses and airfare for the arsonist to travel to and from California. He specified that the fire should be set in the early morning hours, between one and four a.m. on a Sunday, in December or early

3

January. Caldwell repeatedly insisted that the funeral home had to be burned flat to the ground, so that it could not be rebuilt. After Axley reported these conversations to the IRS agent, that agent referred Axley to an ATF agent, who had Axley wear a recording device at future meetings.

On December 13, 1995, in a recorded conversation at a restaurant between Caldwell and Axley, Axley proposed "a former client" that he had "bonded out" to be the arsonist instead of his brother-in-law. Axley brought a bail bond file containing "dummy" information and a picture of the proposed arsonist. The information in the file was fictitious, and the picture was of an agent. Caldwell was adamant that he did not want to see the proposed arsonist's picture or ever meet him.

After discussing the arsonist's fee, Caldwell repeatedly sought assurances that the proposed arsonist had experience and would burn the building to the ground. Caldwell wanted Axley to "swear by" the arsonist.

When Axley told Caldwell that the proposed arsonist would charge only $2,000, Caldwell replied: "you can't lose on that." Caldwell promised that Axley's fee would be "a lot more" than the "couple of hundred" dollars Axley suggested. Caldwell indicated he could use Southwest Airlines flight coupons to fly the arsonist to California. During this meeting, Caldwell stated that "it's a

4

go."[4]

In a subsequent meeting on January 10, 1996, Caldwell expressed his concern regarding whether the proposed arsonist could do the job. Caldwell suggested that he would advance $700 for the arsonist's flight and expenses. In a previous conversation, Caldwell had volunteered to have gas containers in the building for the arsonist. During this meeting, he changed his mind because "they might tie me into [it]."

Caldwell informed Axley that a tenant, "a black guy," lived in the funeral home building. Caldwell said that he did not care what happened to the tenant. Caldwell reiterated that the building must be burned "down to the ground."

At a meeting on February 6, Caldwell related to Axley that he was again concerned that after the job was completed the arsonist would come back to haunt them. Caldwell announced that if the arsonist would try to do so, they would "bury" him. The next day, Caldwell and Axley had their last meeting. At this point, Axley believed that Caldwell was "beginning to smell a rat in this deal." Toward the end of the meeting, Caldwell directed Axley to tell the arsonist "no for right now. Now, he'll be back here if we want him two weeks from now." Immediately after this conversation, Caldwell was arrested.

A grand jury returned an indictment charging Caldwell with

_____

[4] On December 15, Caldwell phoned Axley and discussed the proposed arson in a recorded conversation.

5

violating 18 U.S.C. § 373(a) by soliciting another person to commit arson in violation of 18 U.S.C. § 844(i). A jury found Caldwell guilty as charged. The district court sentenced him to 57 months imprisonment and imposed a $10,000 fine.

II. ANALYSIS

A. SUFFICIENCY OF THE EVIDENCE

When reviewing the sufficiency of the evidence, this Court views all evidence, whether circumstantial or direct, in the light most favorable to the Government with all reasonable inferences to be made in support of the jury's verdict. United States v. Salazar, 958 F.2d 1285, 1290-91 (5th Cir.), cert. denied, 506 U.S. 863, 113 S.Ct. 185 (1992). The evidence is sufficient to support a conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. United States v. Faulkner, 17 F.3d 745, 768 (5th Cir.), cert. denied, 513 U.S. 870, 115 S.Ct. 193 (1994).

To establish solicitation "under 18 U.S.C. § 373, the Government must prove that the defendant intended for another person to engage in conduct which violates Title 18, and that the defendant induced or tried to persuade that other person to commit the crime." United States v. Razo-Leora, 961 F.2d 1140, 1147 n.6

6

(5th Cir. 1992) (citation omitted).  To establish a violation of 18 U.S.C. § 844(i), the Government must prove the defendant: (1) maliciously damaged or destroyed a building; (2) by means of fire; and (3) the building was being used in activity affecting interstate commerce.  United States v. Nguyen, 28 F.3d 477, 480 (5th Cir. 1994).

1.  Serious effort

Caldwell argues that the evidence is insufficient to support his conviction for soliciting another person to commit arson because he never made a "serious effort" to induce another to commit arson.  Thus, he claims the evidence does not support the intent element of solicitation because his solicitations were not serious.  We disagree.

Caldwell promised payment to Axley for having the building burned to the ground of "a lot more" than the $200 Axley suggested.  Although he never tendered the money, Caldwell offered $2,000 plus expenses for Axley's arsonist.

Caldwell threatened to "bury" Axley's arsonist if, after setting the fire, he should later "hold them up."  This is a further manifestation of seriousness.

There are also repeated and specific solicitations by Caldwell of Axley and Axley's arsonist.  Caldwell held forth at length in soliciting the commission of the offense, and also made express protestations of seriousness in soliciting the commission of the offense.

7

Caldwell made inquiries as to the experience of Axley's proposed arsonist. And it appears that Caldwell believed that the proposed arsonist had experience in successfully burning down buildings.

Additionally, Caldwell made preparations for the commission of the offense by bringing a floor plan and discussing the placement of water heaters and potential combustibles. Finally, Caldwell expressed his total disregard for the life of the caretaker of the funeral home. The evidence shows manifestations of considerable seriousness regarding Caldwell's intent to solicit.

In an argument Caldwell briefly mentions within this issue (and explores in more detail in his constructive amendment issue), Caldwell contends that the evidence was insufficient because he did not solicit Axley to actually set the fire. The evidence shows, however, that Caldwell solicited both Axley and the proposed arsonist. Caldwell proposed that Axley have the important role of arranging the scheme and acting as a buffer to distance himself from the person setting the fire. Caldwell solicited Axley to make all of the arrangements with the proposed arsonist and to pass along the compensation for setting the fire. Caldwell proposed compensating both Axley and the arsonist. Viewing the evidence in the light most favorable to the verdict, there is sufficient evidence to show that Caldwell made a serious effort to solicit another person (both Axley and Axley's proposed arsonist) to engage in conduct in violation of Title 18.

2.  Interstate Commerce Connection

Caldwell also argues that the Government failed to prove the interstate commerce element of § 844(i), that the funeral home was being used in interstate commerce or in an activity affecting interstate commerce.   The Government introduced invoices into evidence showing that from December 13, 1995 to February 1996, the funeral home purchased caskets that were manufactured outside of California.   Additionally, the caretaker of the funeral home testified that he had worked there since December of 1995,[5] and that during that time bodies had been shipped to and from places such as Detroit, Washington, D.C., and Guadalajara, Mexico. Viewed in the light most favorable to the verdict, this evidence is sufficient to satisfy the interstate commerce element of § 844(i).[6]

B.    CONSTRUCTIVE AMENDMENT OF INDICTMENT/VARIANCE

"The Fifth Amendment guarantees that a criminal defendant will be tried only on charges alleged in a grand jury indictment." United States v. Arlen, 947 F.2d 139, 144 (5th Cir. 1991), cert. denied, 503 U.S. 939, 112 S. Ct. 1480 (1992).   "The indictment

---

[5]  He also testified that he worked at the funeral home for a brief time during the summer of 1995.

[6]  The indictment alleges that Caldwell solicited Axley to commit arson "on or about between September, 1995 and February 7, 1996." Caldwell contends that there is no evidence that the funeral home was in operation prior to December 12, 1995.  Caldwell apparently concedes the evidence was sufficient for the remaining period of time.  We are aware of no authority (and Caldwell cites none) that requires the Government to prove that the business or property in question was involved in interstate commerce every day of the period alleged in the indictment.  Moreover, the earliest date Caldwell proposed to commit the arson was December 1995.

9

cannot be `broadened or altered' except by the grand jury." Id. (citations omitted). "A constructive amendment of the indictment occurs when the Government changes its theory during trial so as to urge the jury to convict on a basis broader than that charged in the indictment." United States v. Salvatore, 110 F.3d 1131, 1145 (5th Cir. 1997) (citation and internal quotation marks omitted). A constructive amendment can also occur if "the trial court `through its instructions and facts it permits in evidence, allows proof of an essential element of a crime on an alternative basis permitted by the statute but not charged in the indictment.'" Id. (quoting United States v. Slovacek, 867 F.2d 842, 847 (5th Cir.), cert. denied, 490 U.S. 1094, 109 S.Ct. 2441 (1989)). The determinative question is whether the jury was allowed to convict the defendant based "upon a set of facts distinctly different from that set forth in the indictment." United States v. Chandler, 858 F.2d 254, 257 (5th Cir. 1988) (citation and internal quotation marks omitted). Constructive amendments are reversible per se because the defendant may have been convicted on a basis not alleged in the indictment. United States v. Young, 730 F.2d 221, 223 (5th Cir. 1984).

Caldwell contends that the Government's closing argument and the jury charge constructively amended the indictment. The indictment charged that:

> On or about between September, 1995 and February 7, 1996, . . . [Caldwell] . . . with intent that Walter Axley engage in conduct constituting a felony . . . did solicit, command, induce an endeavor to persuade Walter

10

Axley to engage in such conduct, that is, to maliciously damage and destroy and attempt to damage and destroy by means of fire, a building . . . used in or in an activity affecting interstate commerce in violation of [18 U.S.C.] Section 844(i) and 2, all in violation of [18 U.S.C.] Section 373.

Caldwell argues that "[t]he Government made no effort to prove that [he] ever intended for Axley to personally commit arson as specifically charged in the [i]ndictment. Instead, it simply argued that the jury could convict based on a finding that `Caldwell got Walt Axley to find someone to burn that funeral home.'" Caldwell asserts that this argument was consistent with the charge given by the court.[7] Contrary to Caldwell's assertion, the jury charge is nearly identical to the charge in the indictment.[8] More importantly, we do not believe that the jury was allowed to convict Caldwell on a factual basis that effectively

---

[7] We note that Caldwell failed to object at the time of this jury argument. The Government does not argue that this claim should be reviewed only for plain error. See United States v. Reyes, 102 F.2d 1361, 1365 (5th Cir. 1996) (reversal not required under plain error standard even though this Court found the indictment had been constructively amended). Perhaps this is because Caldwell did raise the issue of constructive amendment in his motion for judgment of acquittal filed after the verdict. In any event, because we conclude that there was no constructive amendment, we need not reach the question whether the issue was raised in a timely manner in the district court.

[8] In pertinent part, the indictment charges:

That, as described in the indictment, the defendant solicited, commanded, induced or endeavored to persuade Walter Axley to engage in conduct constituting a felony that has as an element the use of physical force against the person or property of another in violation of the laws of the United States, that is: the malicious damage or destruction by fire of a building or other property used in or affecting interstate commerce "arson."

11

modified an essential element of the crime charged.

Caldwell nevertheless contends that although the indictment charged him with soliciting Axley to commit arson, the evidence at trial demonstrated that he solicited Axley to find a third party to commit arson. Under either scenario, however, Caldwell was soliciting Axley to commit arson.[9] In other words, the jury was <u>not</u> allowed to convict him "upon a set of facts distinctly

---

[9] Relying on two Fifth Circuit cases, Caldwell argues that because the phrase "that is" is used in the indictment, it must be construed as charging him with soliciting Axley, and only Axley, to actually commit arson. <u>United States v. Adams</u>, 778 F.2d 1117 (5th Cir. 1985); <u>United States v. Salinas</u>, 654 F.2d 319 (5th Cir. 1981), overruled on other grounds by <u>United States v. Adamson</u>, 700 F.2d 953 (5th Cir.), <u>cert. denied</u>, 464 U.S. 833, 104 S.Ct. 116 (1983). We find both cases inapposite. In <u>Salinas</u>, the indictment charged that the defendant aided and abetted Lewis Woodul, who was president of the bank, in the misapplication of bank funds in connection with a particular loan. At trial, however, the evidence showed that another bank officer had approved that loan, and Woodul had nothing to do with that loan. The court charged that jury that it could convict Salinas if it found that he had aided and abetted any officer, director, or employee of the bank. We found this to be a constructive amendment of the indictment, explaining that Salinas was charged with aiding and abetting Woodul and that once it was shown that Woodul was not involved, "it begins to look like [Salinas] was convicted of a crime different from that of which he was accused." <u>Id</u>. at 325. Unlike Salinas, Caldwell was charged with and convicted of the same crime, <u>e.g.</u>, soliciting Axley.

In <u>Adams</u>, the defendant was charged with furnishing false identification to a licensed firearms dealer in connection with a handgun purchase. The indictment specifically alleged that the driver's license was false in that it represented that the defendant was named Ernest Cole rather than his legal name, Ernest Adams. At trial, over objection, the Government presented evidence showing that the address on his driver's license was also false. Also over objection, the court's charge to the jury allowed it to convict Adams based on the false statement as to his residence. This Court held that the evidence and instructions constructively amended the indictment. In Caldwell's case, however, the indictment and jury instructions charged the same offense--no elements of the offense were modified.

12

different from that set forth in the indictment." <u>Chandler</u>, <u>supra</u>. Therefore, no constructive amendment of the indictment occurred.

Caldwell's argument is more akin to a claim of variance between the proof and the indictment. "A variance occurs where the evidence proves facts different from those alleged in the indictment, but does not modify an essential element of the charged offense." <u>Salvatore</u>, 110 F.3d at 1145. We review a variance claim for harmless error and will reverse only upon a showing that the variance prejudiced the defendant's substantial rights. In making this determination of prejudice, "[t]he concerns underlying our cases on variance are to ensure that the indictment notifies a defendant adequately to permit him to prepare his defense, and does not leave the defendant vulnerable to a later prosecution because of failure to define the offense with particularity." <u>United States v. Dean</u>, 59 F.3d 1479, 1491 (5th Cir. 1995), <u>cert. denied</u>, __ U.S. __, 116 S.Ct. 748 (1996).

Because Caldwell cannot show that his substantial rights were prejudiced, we assume without deciding that the proof adduced at trial constituted a variance. The record makes clear that, as early as the pretrial detention hearing, he was aware that the Government's theory of the case was that he solicited Axley to hire a third party to commit the arson. Caldwell cannot now claim that the indictment failed to give him sufficient notice to adequately prepare his defense. Additionally, Caldwell does not argue, nor do

13

we believe that the offense was defined with such a lack of particularity as to leave him vulnerable to a later prosecution. Under these circumstances, we find the error, if any, harmless.

C.   GOVERNMENT'S USE OF FALSE TESTIMONY

Caldwell argues that the Government improperly elicited false testimony from Axley. To obtain reversal, Caldwell must show: (1) the challenged testimony was actually false; (2) the testimony was material; and (3) the Government knew that it was false. United States v. Blackburn, 9 F.3d 353, 357 (5th Cir. 1993), cert. denied, 513 U.S. 830, 115 S.Ct. 102 (1994).

In support of his argument, Caldwell points to Axley's testimony at trial that Caldwell initiated the discussion regarding arson during their first meeting on the airplane. Caldwell compares this testimony with the testimony of Agent Duncan, who stated under oath prior to trial that Axley informed him that arson was not discussed until a subsequent meeting.

While Caldwell has shown conflicting testimony as to one detail, he falls short of showing that Axley's testimony was false. Even assuming the testimony was false and the Government had knowledge of it, Caldwell has failed to show that the testimony was material. He argues that the testimony was material because it portrayed him as the initiator of the discussions of arson, and it prevented him from presenting an otherwise viable entrapment defense. These arguments are entirely without merit.

Caldwell has never denied that he brought up the subject of

14

burning the funeral home in his conversations with Axley. During the pretrial hearing, Caldwell took the stand, and the district court inquired whether Caldwell was going to testify that it was Axley that "came up with the idea of burning down the place." Caldwell responded "No, sir, I'm not going to tell you that." Caldwell further admitted that he "did come to [Axley]. And I asked [Axley,] but that was the only time in a moment and that was the only time. There was no reason." In light of these admissions, Caldwell is precluded from showing that the complained of testimony was material, and thus, this claim fails.

D.    ADMISSION OF HEARSAY

Caldwell argues that the district court erred in allowing certain hearsay testimony. Specifically, Axley testified regarding what other prosecution witnesses had told him about Caldwell. This Court reviews evidentiary error for abuse of discretion. United States v. Dickey, 102 F.3d 157, 163 (5th Cir. 1996).

On cross examination, Axley admitted that he was strongly biased against Caldwell, that he desired to have Caldwell convicted, and that he had expressed these sentiments in front of several prosecution witnesses prior to trial. Defense counsel also inquired whether Axley and another prosecution witness agreed that they "need[ed] to get this guy [Caldwell]." Axley responded "I wouldn't have said it if he hadn't said what he said to me." On redirect, the Government asked Axley to testify regarding the reasons the other witnesses reported for their "predisposition

15

against Mr. Caldwell."  Caldwell objected that the statements were inflammatory, hearsay, not probative, and highly prejudicial.  The court overruled his objections, stating that Caldwell had "opened the door to this."

We are not persuaded by the Government's argument that Caldwell "opened the door" to the challenged testimony.  See United States v. Gibson, 363 F.2d 146, 148 (5th Cir. 1966) (explaining that "[p]roper cross-examination on the Agent's knowledge of the affair did not open the gates to an avalanche of hearsay testimony on what might have been said by other unidentified parties").  In any event, in light of the direct evidence of Caldwell's solicitation preserved in the recorded conversations, we fail to see how the evidence of the other witnesses' predisposition against Caldwell could have had a substantial impact on the jury's verdict.  Thus, any error is harmless.  Dickey, 102 F.3d at 163.

E.    UNANIMITY INSTRUCTION

Caldwell contends that the district court erred in refusing to give a requested unanimity instruction to the jury.  Caldwell objected to the court's failure to instruct the jurors that, to find him guilty, they must unanimously agree on at least one act that constituted solicitation.  This Court presumes a district court has abused its discretion if it refuses to charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent.  United States v. Correa-Ventura, 6

16

F.3d 1070, 1076 (5th Cir. 1993). The following three-part test is used for determining reversible error: if the instruction (1) was substantially correct; (2) was not substantially covered in the charge delivered to the jury; and (3) concerned an important issue so that the failure to give it seriously impaired the defendant's ability to present a given defense. Id.

Here, the court gave a general unanimity instruction to the jury.[10] "In the routine case, a general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability." United States v. Holley, 942 F.2d 916, 926 (5th Cir. 1991) (citation omitted). "However, such an instruction will be inadequate to protect the defendant's constitutional right to a unanimous verdict where there exists a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." Id. (citation omitted) (internal quotation marks omitted).

Caldwell asserts that the primary evidence of solicitation consisted of numerous statements he made during his several conversations with Axley between September 1995 and February 7, 1996. He further asserts that the Government made no effort to identify the statements that would constitute a solicitation, and

---

[10] "Any verdict must represent the considered judgment of each juror. To return a verdict, each juror must agree to the verdict. In other words, your verdict must be unanimous."

17

the term was not defined for the jury.

In United States v. Correa-Ventura, we explained that there are two levels of unanimity: "unanimity as to verdict and unanimity as to the critical facts necessary to support that verdict." 6 F.3d at 1078. On one hand, unanimity is more than a conclusory agreement that the defendant has violated the statute. Id. On the other, courts have acknowledged "the concern that demanding total factual concurrence on each detail of the crime's commission is not warranted and will make it impossible for the government to obtain a conviction." Id. We observed that the Supreme Court has time and again recognized that "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." Id. (citing McKoy v. North Carolina, 494 U.S. 433, 449, 110 S.Ct. 1227, 1237 (1990) (Blackmun, J. concurring)).

In Correa-Ventura, the appellant argued that the court erred by not requiring the jurors to unanimously agree on which of the weapons seized from his residence was used in commission of the drug trafficking offense in violation of 18 U.S.C. § 924(c). We opined that that case was distinguishable from a case in which there could be a difference among jurors as to which of the statutorily enumerated means was used to commit the same crime. E.g., United States v. Gipson, 553 F.2d 453, 458 (5th Cir. 1977)

18

(defendant charged with violating statute that prohibited six different acts: receiving, concealing, storing, bartering, selling, or disposing of a stolen vehicle moving in interstate commerce).

Correa-Ventura did not involve an election between statutory means, instead, it was purely a question of unanimity, i.e., "whether the firearm component of the crime require[d] factual concurrence." 6 F.3d at 1080. "We conclude[d] that factual concurrence must be viewed on a case-by-case basis to address the concerns discussed above and to insure that the purposes of unanimity are satisfied." Id. at 1082. This Court instructed that:

> Statutory language and construction, legislative intent, historical treatment of the crime by the courts, duplicity concerns with respect to defining the offense, and the likelihood of jury confusion in light of the specific facts presented are all necessary inquiries to be addressed before a trial judge can ascertain whether he must instruct the jury to concur in predicate facts as well as in result.

Id. When examining the above factors, the court must consider precisely what conduct the statute is intended to punish and deter. Id. In that case, we determined that a specific unanimity instruction was not required to determine the identity of the firearm.

Like Correa-Ventura, the instant case does not involve an election between statutory means, but instead the question is whether factual concurrence is required in regard to what particular act(s) constituted solicitation. In other words, if

19

some jurors believed that certain statements or acts constituted the offense of solicitation of arson and other jurors believed that different statements or acts constituted solicitation, does that disagreement indicate a reasonable doubt that Caldwell committed the offense of solicitation of arson?  See Correa-Ventura, 6 F.3d at 1082-83.

The statute in question, 18 U.S.C. § 373 provides that:

Whoever, with intent that another person engage in conduct constituting a felony that has an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than one-half the maximum term of imprisonment . . . prescribed for the punishment of the crime solicited . . . .

The plain language of § 373 does not indicate a requirement of unanimity regarding what particular statements or acts constitute solicitation.  As the Government asserts, the focus of the offense is persuading one to commit that offense, and persuasion of another could certainly include acts and statements occurring over a period of time.

Indeed, the legislative history of § 373 gives the following examples of strongly corroborative circumstances that are probative of intent:  "the fact that the defendant repeatedly solicited the commission of the offense, held forth at length in soliciting the commission of the offense, or made express protestations of seriousness in soliciting the commission of the offense."  United

20

States v. Gabriel, 810 F.2d 627, 635 (7th Cir. 1987) (quoting S.Rep. No. 307, 97th Cong., 1st Sess. 183, (1982)) (emphasis added). This language does not support a conclusion that verdict specificity regarding the precise act or statement that constituted solicitation is required. Rather, it counsels the opposite.

In regard to duplicity concerns, "where each instance of allegedly criminal activity could be a separate offense, courts are more inclined to require that jurors be unanimous as to which instance is the basis of liability." Correa-Ventura. That is not a problem in this case. This case involved only one offense of solicitation. Caldwell spoke to only one person regarding the burning of one building. There seems little likelihood of jury confusion on the facts of this case. We are satisfied that the district court did not abuse its discretion in refusing to give a specific unanimity instruction.[11]

F.   OBSTRUCTION OF JUSTICE

Caldwell argues that the district court erred in imposing a two-level increase in his offense level for obstruction of justice based on a finding of perjured testimony. U.S.S.G. § 3C1.1. A district court's finding that a defendant has obstructed justice

---

[11] Caldwell also contends that the court should have instructed the jurors that they must unanimously agree that the funeral home was engaged in an activity affecting interstate commerce when the act of solicitation was committed. As set forth previously, the earliest date Caldwell proposed for the arson was December of 1995, and Caldwell does not dispute that the interstate commerce element was satisfied at that time. Under these circumstances, the district court did not abuse its discretion in refusing to give this instruction.

21

under section 3C1.1 is a factual finding and thus, reviewed for clear error.  United States v. Laury, 985 F.2d 1293, 1308 (5th Cir. 1993).

Section 3C1.1 provides that: "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."[12]  If a district court finds that a defendant has committed perjury at trial, an enhancement is required under section 3C1.1. United States v. Humphrey, 7 F.3d 1186, 1189 (5th Cir. 1993).

Caldwell asserts that the sentencing court (Judge Maloney), over his objection and without making any independent findings, imposed this enhancement based solely on a finding made by Judge Buchmeyer, who had presided over the pretrial detention hearing, that he had committed perjury during that proceeding.  Caldwell argues that this was inadequate because "[t]he district court was required to actually make a finding as to whether Appellant lied and, if so, whether he lied as to a material matter."

The Supreme Court has opined that "[i]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or

_____

[12]  The commentary lists committing perjury and providing materially false information to a judge or magistrate as examples of conduct to which the enhancement applies.  U.S.S.G. § 3C1.1 comment. (n.3(b) and (f)).

22

obstruction of justice, or an attempt to do the same, under the perjury definition."  United States v. Dunnigan, 507 U.S. 87, 113 S.Ct. 1111, 1117 (1993).  "A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory."  Id. at 1116.  When the district court is making such a finding, the preferable practice is to address each element of the alleged perjury in a separate and clear finding.  Id. at 1117.  The finding is sufficient, however, if the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury.  Id.[13]

In regard to whether the sentencing court actually made an independent finding, the Government's brief points out that "[t]he sentencing judge overruled Caldwell's objection to the obstruction of justice enhancement, stating that he was basing his ruling `on Judge Buchmeyer's findings after the hearing that the defendant lied to him in connection with the hearing involved and the facts

---

[13]  This Court has affirmed an obstruction of justice enhancement based on the following findings by a district court:

> Obviously if the jury's verdict means anything, then Mr. Laury did commit perjury when he testified, and I believe the jury's verdict means exactly what it found.  . . .

If the jury had been convinced that Laury had obtained the money as he indicated, it may have affected the determination of guilt. Statements made by the defendant were made in an effort to obstruct or impede the administration of justice during prosecution.

Laury, 985 F.2d at 1309.

23

of this case.'"   Relying on <u>United States v. Cabral-Castillo</u>, the Government asserts that it was permissible for the district court to adopt the findings of another judge.  35 F.3d 182 (5th Cir. 1984), <u>cert. denied</u>, __ U.S. __, 115 S.Ct. 1157 (1995).  In <u>Cabral-Castillo</u>, the sentencing judge overruled the defendant's objections, opining that, in regard to "the obstruction of justice [finding], which has to do with his allegedly false testimony, there is a finding that was made by another Court on that, and the Probation Office just reflected that.  And I think that's a fact finding that I'm entitled to rely on."  <u>Id</u>. at 186.  Because the sentencing judge adopted the findings of the other judge, we treated those findings as his own findings.  <u>Id</u>.; <u>cf</u>. <u>Laury</u>, 985 F.2d at 1308 n.18 (explaining that when the court adopts the findings in the presentence report, they are treated as his own findings).  Therefore, in the instant case, we may treat Judge Buchmeyer's findings as if they were made by the sentencing court.

The next question is whether those findings were sufficient to indicate that the perjured testimony was "material."  The commentary to § 3C1.1 provides that "`[m]aterial' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."  § 3C1.1, comment. (n.5).

After hearing Caldwell's testimony at the detention hearing, Judge Buchmeyer found that:

24

> Caldwell lied repeatedly during his testimony at the February 13, 1996 hearing. His "explanations" that he was never serious about burning down the funeral home, that he "merely" engaged in discussions on the tapes because he was afraid of the informant, and that he was a reluctant participant in these discussions, were false. The defendant was not credible, and this Court rejects his testimony.

Apparently neither the sentencing court nor Judge Buchmeyer expressly found that Caldwell's false testimony was material. Nevertheless, this Court has upheld an implicit finding of materiality when it determined that the testimony was designed to substantially affect the outcome of the case. Cabral-Castillo, 35 F.3d at 187.

Here, it is clear that Caldwell's testimony at the pretrial detention hearing was designed to substantially affect the outcome of that proceeding. The two issues at the hearing were (1) whether probable cause existed to find that Caldwell committed the offense of solicitation to commit arson and (2) whether the Government presented clear and convincing evidence that no conditions of release will reasonably assure the safety of other persons and the community. If Judge Buchmeyer had credited Caldwell's testimony that he was not serious about the arson, the outcome of the proceeding presumably would have been different. Although the district court's findings could have been more detailed, after reviewing the record, we conclude that it is clear that the court found the testimony material. See United States v. Como, 53 F.3d 87, 91 (5th Cir. 1995), cert. denied, __ U.S. __, 116 S.Ct. 714 (1996).

25

AFFIRMED.